IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THE MAYOR AND CITY COUNCIL   *
OF BALTIMORE,
                             *
   Plaintiff
                             *
   v.                                    CIVIL NO. JKB-12-614
                             *
UNISYS CORPORATION,
                             *
   Defendant                 *

                             *

*   *   *   *   *   *   *   *   *   *   *   *

## MEMORANDUM

The Mayor and City Council of Baltimore ("Plaintiff") brought this suit against the Unisys Corporation ("Defendant") seeking compensatory and punitive damages for alleged breaches of contract and express warranties, unjust enrichment, negligent misrepresentation, and intentional misrepresentation.[1]  Now pending before the Court is Defendant's motion for summary judgment.  (ECF No. 170.)  The issues have been briefed (ECF Nos. 170, 180, 188), and no hearing is required, Local Rule 105.6.  For the reasons explained below, Defendant's motion for summary judgment will be GRANTED IN PART and DENIED IN PART.

A.   BACKGROUND[2]

Plaintiff entered into a contract with Defendant in May 2002 for the development and installation of computer software, referred to as an "Integrated Property Tax System" or "the

---

[1] The Court dismissed Plaintiff's claims for unjust enrichment (Count III) and negligent misrepresentation (Count IV) in a prior order.  (ECF No. 18.)  Plaintiff has now abandoned its claim for breach of express warranty (Count II) and has withdrawn its request for consequential damages.  (ECF No. 180 at 6 n.1.)

[2] The Court here recounts the facts as alleged by the Plaintiff, the non-moving party.  *See New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005).

1

System," which would integrate functions and databases related to the City's tax assessment and billing.  The contract and accompanying documents projected that the software would be ready for use by November 2003, but this estimate was repeatedly pushed back over the following nine years.  The parties each deny responsibility for these delays, and instead each blames the other.

Plaintiff alleges that Defendant's software was hopelessly riddled with errors; anytime Defendant would correct one set of issues, a new crop of problems would soon appear.  (ECF No. 180 at 9-10.)  In 2006, Defendant allegedly caused further delays when it removed its subcontractor from the project for failing to deliver acceptable software.  (*Id.* at 10.)  In March 2010 the parties agreed to focus on 217 "Priority A" issues—"show stoppers"—that Defendant would correct.  (*Id.* at 11.)  In contrast, Defendant alleges that performance delays were caused by Plaintiff's problematic involvement with the System's development.  Plaintiff allegedly failed to share timely and accurate data with Defendant's developers (ECF No. 170-1 at 11-12), and also relied on inexperienced software testers, (*Id.* at 13).

By December 2010, Plaintiff had paid Defendant over $8 million, but the System remained non-operational—suspended in development.  In March 2011, Plaintiff declared Defendant in default, stating: "As of December 2010, there were approximately 217 Priority 'A' issues preventing the system from going live.  Consequently, UNISYS Corporation failed to complete Phase I of the Contract and has failed to meet the terms expressly agreed upon in the Contract."  (ECF No. 180-27.)

Within days, Defendant claimed to have resolved all remaining software problems and announced that it was prepared to move to the next project milestone, "Acceptance Testing." Acceptance Testing was to be a client-driven process "to verify that the agreed software requirements ha[d] been satisfied."  (ECF No. 180-11 § 2.1.3.)  In reliance on this claim, Plaintiff

2

agreed to conduct a new form of testing—"Validation Testing."  Validation Testing was introduced as an intermediate form of testing, to measure whether all critical errors had truly been resolved and thus whether the software was actually ready to move forward with Acceptance Testing.  (*See* ECF No. 170-1 at 20; ECF No. 180-8 at 29-30.)  Acceptance Testing was specifically provided for in the contract and accompanying Statement of Work.  (ECF No. 180-3 § 11; ECF No. 180-2 § 9.)  Validation Testing, its precursor, was apparently not contemplated during contract drafting and is not expressly provided for in the contract.  That said, the parties informally agreed to engage in Validation Testing after Plaintiff's declaration of default.  Plaintiff ultimately terminated the contract when Validation Testing revealed new errors.  Acceptance Testing was never formally attempted.

On January 18, 2012, Plaintiff filed the instant complaint in the Circuit Court for Baltimore City.  Defendant removed the case to this Court, and on March 2, 2012, Defendant filed an answer to the complaint (ECF No. 9), along with a partial motion to dismiss for failure to state a claim, (ECF No. 11).  The motion was fully briefed (ECF Nos. 11, 12, 14), and the Court granted it in part and denied it in part on August 16, 2012, (ECF No. 18).  Plaintiff proceeded with discovery on its surviving claims, and Defendant filed this motion for summary judgment on May 7, 2014.

## B.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)).  The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  If

3

sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252.  The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1).  Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit.  Rule 56(c)(4).

## C.   ANALYSIS

### 1.  Count I: Breach of Contract

Count I of the complaint alleges that Defendant breached the contract when it failed to deliver a fully functional and integrated tax system by March 2011.  Defendant has moved for summary judgment, claiming that it faces no liability for two alternative reasons.  First, Defendant argues that Acceptance Testing represented the sole contractual basis for Plaintiff to assess Defendant's performance.  Second, Defendant argues that a performance delay on its own is not a proper ground for termination where the contract does not include an explicit performance deadline.

Preliminarily, the Court holds that failure during Acceptance Testing is not Defendant's only potential means of breaching on performance grounds.  Certainly, the contract expressly

4

identifies Acceptance Testing as a vehicle for Plaintiff's assessment of the software. (*See* ECF No. 180-3 § 24.1 ("Acceptance Tests . . . provide the mechanism for determining whether the System and customized parts of it meet the Client's requirements . . . .").) Nonetheless, the contract does not shelter Defendant from all liability for breach of contract, with the singular exception being failed performance in Acceptance Testing; the contract neither expressly carves out Defendant's claimed protection from liability, nor does the Court infer that such a drastic provision was intended by the parties. Indeed, language in the contract and related documents implies that Acceptance Testing was, *at most*, the sole method for assessing software failure.[3] (*See id.*; *see also* ECF No. 180-2 § 9.2 ("The [Acceptance Test Plan] shall constitute the sole basis for acceptance testing of the ITPS [sic] System.").) Taken together, the two provisions cited may show that the parties intended that Acceptance Testing be the only method for assessing breach of contract for software failure. But such an interpretation of the contract does not preclude the possibility that Defendant breached the overall agreement in some other fashion.

Indeed, Plaintiff's complaint alleges that Defendant failed to perform the contract because it failed to produce a final, functioning version of the System. The complaint does not allege that Defendant's software has failed; in fact, it argues that the software had not yet been completed. Thus, Plaintiff claims that Defendant failed to perform within a reasonable time of the contract's origin in May 2002. Notably, the contract was silent on the issue of time of performance.[4] Defendant contends that, because the contract is silent and the parties never

---

[3] Even this interpretation is subject to debate. The "Acceptance Test Plan" defines a variety of tests that were to take place, identifying Acceptance Testing as one of many. (ECF No. 180-10 § 2.3 (defining other tests, such as an "Integration Test," a "System Test," and a "Conversion Test").) Further, the contract's accompanying Statement of Work includes a process for Plaintiff's assessment of "interim deliverables." (ECF No. 180-2 § 7.9.) Both provisions cut against interpreting Acceptance Testing as the sole basis for assessing the software's development. Regardless, the question is not dispositive of Defendant's motion, and thus the Court does not decide this issue.

[4] According to Defendant, the original Statement of Work did include a projected timeline, estimating that Acceptance Testing would be completed within fifteen months of the project's start. (*See* ECF No. 170-1 at 10.)

Case 1:12-cv-00614-JKB   Document 201   Filed 11/18/14   Page 6 of 13

agreed to impose a strict deadline for performance in subsequent negotiations, Defendant should have been free to take as long as was necessary to complete the System. Defendant's position, though, is only tenable to the extent that it implies that the time "necessary" for completion is also *reasonable* in all the attendant circumstances.

"In the absence of an express time for performance, a reasonable time will be implied." *Anne Arundel Cnty. v. Crofton Corp.*, 410 A.2d 228, 232 (Md. 1980); *see also Giannaris v. Cheng*, 219 F. Supp. 2d 687, 694 (D. Md. 2002) ("[A] contract that does not specify the time of performance . . . will be interpreted as intending performance in 'a reasonable time.'"); 17A Am. Jur. 2d *Contracts* § 467 (2014) ("Where there is no provision as to the time for performance, a reasonable time is implied."); *c.f. City of Bowie v. Mie Props., Inc.*, 922 A.2d 509, 528 (Md. 2007) ("In instances where a covenant does not specify the duration of the restriction or a covenant prescribes an indefinite duration . . . courts, under equity principles, may limit the covenant's duration to a reasonable period of time.").

Determining whether Defendant failed to perform in a reasonable time is a question of fact. "What constitutes a reasonable time for performance of a contractual obligation must be determined by the circumstances of the particular case. The intent of the parties is an important factor in this determination." *Ritz-Craft Corp. v. Stanford Mgmt. Grp.*, 800 F. Supp. 1312, 1318 (D. Md. 1992); *see also Yue v. Conseco Life Ins. Co.*, 2008 WL 5158869, at *7 (C.D. Cal. 2008) ("What constitutes a 'reasonable time' for performance is a question of fact . . . ."); *c.f. Lynx, Inc. v. Ordnance Prods., Inc.*, 327 A.2d 502, 512 (Md. 1974) (noting that, in the context of notices of rejection or breach, "the sufficiency of the notice and whether it was given within a reasonable time are ordinarily questions of fact based upon all the surrounding circumstances"). Thus,

---

This timeline was non-binding, and was quickly rendered irrelevant by the series of delays discussed *supra* Part A at 1-2.

because the contract is silent on this issue, the Court interprets it as intending that performance be completed in a reasonable amount of time, which can only be calculated through a thorough assessment of the facts and circumstances of this case.

As discussed *supra* in Part A at 2, both parties have advanced competing theories of the case that speak to whether Defendant had exceeded a reasonable time for performance by March 2011. These factual disputes are perfectly suited for a jury's assessment. The question for trial is: Had Defendant exceeded a reasonable time for performance in March 2011, when Plaintiff declared default?[5] Subject to the Rules of Evidence, the jury will be able to take all of these alleged circumstances into consideration at trial. For these reasons, Defendant's motion for summary judgment on Count I is denied.

### 2. Count V: Intentional Misrepresentation

Plaintiff's claim for intentional misrepresentation fails because there is insufficient evidence that Defendant inaccurately represented material facts. Moreover, even if Defendant did so represent, there is no evidence that Defendant had the requisite knowledge of falsity when any inaccurate representation was made.

Under Maryland law, the Court's review of the claim for intentional misrepresentation should involve a five-prong analysis:

> "To prevail upon an intentional misrepresentation claim under Maryland common law, the plaintiff must establish the following facts by clear and convincing evidence: (1) the defendant made a false representation to the plaintiff; (2) the falsity was either known to the defendant or the representation was made with reckless indifference as to its truth; (3) the misrepresentation was made for the purpose of defrauding plaintiff; (4) the plaintiff relied on the misrepresentation

---

[5] The party's devote energy in their briefs to discussing whether or not the software was possibly ready for Acceptance Testing at exactly the moment when Plaintiff chose to terminate the contract. A jury is most qualified to determine the prerequisites of Acceptance Testing, and also to assess whether these prerequisites had been satisfied by Defendant at the time the contract was terminated. Still, even if a jury agrees that the software was ready for Acceptance Testing, this may merely factor into the jury's more substantial consideration of whether, given all of the facts and circumstances, Defendant had failed to perform the requirements of the contract in a reasonable time by March 2011.

and [had] the right to rely on it; and (5) the plaintiff suffered compensable injury resulting from the misrepresentation." *Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 444-45 (4th Cir. 2001) (citing *Nails v. S & R, Inc.*, 639 A.2d 660, 668 (Md. 1994)).

Taking the facts in the light most favorable to Plaintiff, the Court finds that there is insufficient evidence to support prongs one and two. Thus, summary judgment in Defendant's favor is appropriate on this claim.

### a. Prong 1: False Representation

The Court carefully considered each alleged inaccuracy that Plaintiff identifies in its Response (ECF No. 180), but finds that no statements made on or about March 22, 2011 constitute clear and convincing evidence of a false representation. In essence, Plaintiff alleges that Defendant falsely reported that it had completed a successful System Test, to have resolved all 217 lingering issues, and to be ready for Acceptance Testing.[6] (ECF No. 180 at 33-50.)

To demonstrate the falsity of these statements, Plaintiff points to the allegedly unsuccessful Validation Testing that subsequently took place, which revealed that several Priority A issues remained unfixed. (*See* ECF No. 180-37.) Validation Testing took place around eight months after the supposedly successful System Test, and applied the same test scripts. (*Id.* § 2.3 ("These were the same scripts that have been used for the past several years and were well known to both Unisys and City staff . . . .").) Plaintiff argues that Defendant's statements claiming a successful System Test must have been false, since Validation Testing's similar analysis identified many unresolved errors. Plaintiff's logic, however, is flawed.

---

[6] (*See, e.g.*, ECF No. 180-28 (letter from Defendant claiming that a March 2011 System Test "completes the final requirement necessary to commence User Acceptance Testing"); ECF No. 180-31 at 6-10 (June 2011 report from Defendant claiming to have addressed all 217 agreed issues and to be prepared for Acceptance Testing).)

Validation Testing may have employed the same test scripts, but it applied those scripts under markedly different conditions. First, the testing was conducted by different people. The System Test was performed by Defendant's employees. (*See* 180-29 at 5 ("System testing was performed by Unisys . . . .").) In comparison, Validation Testing was performed by a third-party software company, MGS. (*See* ECF No. 180-37.) Second, while the two tests applied the same test scripts, Validation Testing often applied those scripts to different properties than those that were used in the System Test. (*See id.* § 2.3 ("The City for the most part selected properties to use with the test scripts to comprise a test scenario and exercise an IPTS capability and Unisys verified that the properties had the proper characteristics for the test."); 180-47 at 8 (expert report by MGS describing Validation Testing's use of different properties).)

These distinctions mute Plaintiff's allegations of false representation. When Plaintiff introduced new conditions to the test setting, it exposed the software to unexpected variables. Defendant's statements claiming success only referred to those conditions applied under the System Test. It made no representation regarding the possible success of subsequent, newly devised tests. Plaintiff's evidence may demonstrate Defendant's confusion about the state of its software, and it may even evidence a breach of contract for failure to perform in a reasonable time. It makes little difference to the strength of Plaintiff's Count I claim whether Defendant failed to perform under the contract as measured by a third-party contractor, or as assessed using a new set of metrics. Nonetheless, these facts do not show false representation, and Plaintiff's Count V claim fails.

### b. Prong 2: Knowledge of Falsity

Even if Defendant's accused statements are assumed to be inaccurate representations, the Court finds insufficient evidence that Defendant had knowledge of their falsity. On this second prong, Plaintiff primarily relies on two pieces of evidence to support its theory of the case. After Defendant claimed to have successfully completed a System Test, Defendant continued to: (1) add functionality to the software; and (2) test portions of the software. (ECF No. 180 at 41.) Plaintiff infers that Defendant's continued efforts to improve the System show that Defendant knew its reported System Test results had been false. The Court concludes that no reasonable jury could find clear and convincing evidence to support Plaintiff's theory on falsity (i.e., such a jury could not find that Defendant's statements and conduct demonstrated knowledge of falsity).

Assuming, *arguendo*, that the System Test results were an incorrect representation of the System's status, Defendant's later work on the System is not evidence that Defendant had knowledge of some falsity. Plaintiff points to a test report and accompanying summary chart from April-May 2011, which shows that certain software requirements still required work, even after the supposedly successful System Test. (*See* ECF Nos. 180-49 & 180-50.) Crucially, this does not speak to knowledge of falsity. These April-May 2011 test results came out *after* the System Test, and so have no bearing on what Defendant was aware of when it released its System Test results in March 2011.[7] Without evidence that Defendant continued to work on those exact errors that had reportedly cleared the System Test, Plaintiff has failed to even imply that Defendant had the requisite knowledge that its System Test results were false. On the record

---

[7] According to Defendant, the System Test and April-May 2011 test are readily distinguished. Unlike the System Test, which was a broad analysis of the entire software based on pre-set test scripts, the April-May 2011 test "attempted to document compliance with contract requirements on a Requirement-by-Requirement basis at a design specification level." (ECF No. 188 at 23 n.4.) The two tests reported on different degrees of granularity, and so successes in the System Test quite possibly had no predictive bearing on how the Software would perform under a more targeted analysis. While the Court does not rely on Defendant's version of events, the Court does find this explanation to be sensible.

before the Court, no reasonable jury could find that these April-May 2011 test results demonstrate that the System Test had in fact resulted in a failure or that representations of success were knowing falsehoods.

Similarly, Defendant's persistent testing after the claimed success of the System Test does not show that Defendant had knowledge of falsity. Plaintiff points to an e-mail between Defendant's employees that states "[s]o far, we have had to adjust every report and we have only completed 7 reports for both format and value." (ECF No. 180-51.) At first glance, the quote appears to be the smoking gun evidence that Plaintiff needs to survive this motion. A more careful review reveals that the quote has been taken out of context. The admitted "adjustments" mostly included text formatting and other aesthetic improvements, such as ensuring that dollar amounts include two-digit decimals and that dollar signs do not appear in the report. (*See id.* (closing the e-mail by stressing that "correcting the inconsistencies in the report presentation is making this application look very professional").) To the extent that portions of this letter may imply that Defendant made substantive amendments to test reports, Plaintiff asks the Court to make a considerable inference based on minimal circumstantial evidence. The "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 248. Taking the facts in the light most favorable to Plaintiff, this e-mail is nothing more than a scintilla of evidence supporting Plaintiff's intentional misrepresentation claim. The e-mail is decidedly insufficient evidence to cause this claim to survive Defendant's motion for summary judgment.

Plaintiff also refers to deposition testimony from Defendant's Chief Technology Officer, allegedly conceding that Defendant continued to find that the 217 Priority A issues were not fully resolved, even after the System Test. (ECF No. 180 at 44.) This quote references the same

April-May 2011 test results discussed above. Again, these results came out *after* the System Test, and so do not show evidence that Defendant had knowledge that the System Test was false when it reported success to Plaintiff. In addition, the cited deposition testimony does not support Plaintiff's contention that the April-May 2011 testing was an acknowledgement of continued failings. Defendant's employee explained that the April-May 2011 testing was intended "to build *additional* quality into the product . . . . [Y]ou're always going to end up with some latent errors. The more attention you pay to that, the better quality product you end up with, the higher reliability of the product. I was trying to make sure that we were delivering the highest quality we could." (ECF No. 180-43 at 8-9 (emphasis added).) Rather than proving that Defendant had knowledge that the System Test was fraudulent, the cited testimony simply exhibits a well-intentioned commitment to continued software improvements. No reasonable jury could conclude otherwise, assuming familiarization with the full record now before the Court.

Again, in support of the intentional misrepresentation claim (Count V), Plaintiff has presented evidence that a jury may well find dispositive on Plaintiff's claim for breach of contract (Count I). Certainly, Defendant's continued testing may show that the software was not ready for a full-scale, citywide release. Nonetheless, Plaintiff has failed to put forward clear and convincing evidence, direct or circumstantial, such that a reasonable jury could conclude that Defendant had actual knowledge, or was recklessly indifferent to the fact, that its System Test report was false. Thus, Plaintiff's intentional misrepresentation claim fails on the second prong as well.

The Court does not address the three remaining prongs of the intentional misrepresentation analysis, having found that Plaintiff's claim fails on the first two. Thus, the Court will grant Defendant's motion for summary judgment on Count V.

**D.     CONCLUSION**

Accordingly, an order shall issue GRANTING IN PART and DENYING IN PART Defendant's Motion for Summary Judgment (ECF No. 170).

DATED this 18th day of November, 2014.

BY THE COURT:

/s/
James K. Bredar
United States District Judge
